May it please the Court. My name is Heather Fraley, and I represent Appellant Armis Arrendondo. The issue in this case is whether Mr. Arrendondo's waiver of his right to counsel was voluntary, knowing, and intelligent, where the trial court forced him to choose between unprepared, incompetent counsel and no counsel. Well, there's really no proof that it was unprepared, incompetent counsel. It only proves that he thought so. Your Honor, there is no evidence in the record to indicate that any investigation was conducted. There is evidence in the record to indicate that in the year and a half prior to trial, Mr. Arrendondo received two communications with counsel outside of court. One was a visit from the first public defender that was assigned. The second was a phone call from the second public defender. The record also demonstrates that over the ---- I'm sorry. Was there any evidence submitted to demonstrate that she was, in fact, ineffective and incompetent, or was that issue even raised directly? I'm sorry. Was that issue even raised directly, whether she was, in fact, incompetent and ineffective? Your Honor, the issue was not specifically raised about whether she was incompetent on appeal. It seems to me that you ought to go on to your other contentions, because in terms  to go on to your other contentions, because factually it just doesn't ---- I understand he thought she was ineffective and incompetent, but beyond that, he would have to be able to prove that up, and he has made no attempt to do that. Well, Your Honor, this issue was raised on direct appeal, and factually ---- That issue was raised. The issue was raised that he thought he should ---- he preferred to have a lawyer, but he wanted a different one, but not any attempt to prove that she was actually incompetent and ineffective as opposed to there was a breakdown and he didn't want her. Your Honor, during the pretrial phase, Mr. Arradondo repeatedly attempted to prove that his lawyer was incompetent. On direct appeal, he was appointed counsel. His counsel raised the issue that his waiver of his right to counsel was not voluntary, knowing, and intelligent. In the direct appeal briefing, it is true that he did not specifically discuss the issues in the case. However, when the Nevada Supreme Court ruled that the waiver was voluntary, knowing, and intelligent, the Court specifically held that it reviewed the entire record in the case. And one cannot review the Ferretta hearing in this case without noticing the problems that were inherent in this case. Mr. Arradondo said repeatedly at the Ferretta hearing that he felt that he was being forced to choose between no counsel and incompetent counsel. And the trial judge said he didn't care. The trial judge said it doesn't matter. Assuming we don't think you really exhausted that in Nevada, do you have any other argument you wish to make? Of course, Your Honor. The two related arguments are this argument and the other argument is that the other problem in this case is that Mr. Arradondo was misinformed that he was facing a maximum sentence of 20 years when, in fact, he was facing two life sentences. Clearly established Federal law and the Federal law of the United States, it's not    It's the Federal law of the United States, and Ferretta v. California clearly holds that a defendant must be made aware of the dangers and disadvantages of self-representation. Maybe you could explain something to me about Nevada law. Is the prosecuting authority required to allege in the indictment the possibility of an enhancement? No, Your Honor. The State is allowed to and consistently does file the – because this is a statutory They have to give notice, though. Yes, but they can give notice after the conviction. I was going to just ask you, does the statute require notice be given at any particular time? Honestly, Your Honor, I don't know the time. I do know that it's permissible under the law that notice be given after the conviction is entered, and that's what happened in this case, okay? Despite the fact that the prosecution didn't give notice until after, at the time of the Ferretta canvass, everybody in the room knew that the State was going to seek habitual criminal status in this case, except for Mr. Arrandondo. Well, that reflected in the record. Okay. So prior to trial, Mr. Arrandondo twice sought bail reductions in this case. Both times, the State opposed the bail reductions on the ground that Mr. Arrandondo was a three-time convicted felon. Both times, the trial court denied the motion. That doesn't necessarily mean that they're going to go for a lifetime enhancements you know, for these enhancements that we're getting a life sentence. Your Honor, we would argue that it pretty much was a foregone conclusion. I mean, for the Isn't the question anyway not what he – if this came up actually in the cases we were arguing earlier, not whether he was actually – whether there was going to be such a claim, but that there could be. Exactly. And Ferretta requires that he be informed of the possible consequences. Well, but I don't know about the informed part. I mean, our later case law and the Supreme Court's later case law seems to focus more on what the person actually knew rather than – it shies away from any formal colloquy requirement and says, well, what did this person actually know? Absolutely. So I would think about it that way. And here what we know is that he – we know he didn't know, in fact. Exactly. Mr. Arendando did not know that the State was going to seek habitual criminal status. And that is clear. Well, he didn't know more than that. He didn't know that that was even a – there's no – that it was a possibility. When they asked him what he thought his exposure was, he said something like one to seven years. And the judge said, no, it's 20 years. So he obviously didn't know that it might be life. Exactly, Your Honor. And that is where the issue about counsel's ineffectiveness ties in. Because at the Ferretta hearing, the public defender that was assigned to his case didn't even show up. She had never discussed with him the possible consequences of this case. So not only did the trial judge fail to inform him that he was looking at a life sentence, two life sentences, not only did the prosecution sit there knowing they were going to file these charges and say nothing about it, he didn't even have a lawyer there to tell him. So Mr. Arendando had no – There was a substitute public defender. There was a public defender in the room. There's no indication that that public defender – That he or she was appearing on behalf of his regular public defender. There was a public defender in the room, yes, Your Honor. But there's no indication that that public defender was familiar with the facts of the case and knew that Mr. Arendando was facing habitual criminal status. The public defender – It's an unusual situation here because he said what he thought his exposure was. Precisely, Your Honor. And didn't take this into account. Precisely. Mr. Arendando – He probably knew what his criminal record was. So if he thought there was a possibility and he knew about the habitual criminal thing, he would have said so, but he didn't know it. He didn't know. The trial judge didn't correct him. And he – and Mr. Arendando specifically asked at the canvas, will the prosecution be able to use my priors against me? He asked. The trial judge was on notice at the hearing that Mr. Arendando had these priors, and when he asked, can the State use this against me, all the trial court told him was, well, if you testify, they can be used to impeach you if you have a felony in the next 10 years. But he didn't tell him that he was facing habitual criminal. And the judge in this case had been on the bench at the time of this trial for 20 years. This was an experienced jurist. He knew very well that the State was going to seek this. The State – The next question is, where do we stand under AEDPA with respect to the degree of specificity of this requirement that we can rely on it? Well, Your Honor, we're not asking this Court to hold that there's any new specific requirement. I mean, I think Ferretta is clear, right, that the defendant must be informed of the possible consequences of – of – It says that in – it says that in Ferretta. Your Honor, Ferretta says at 422 U.S. 835, a defendant should be made aware of the dangers and disadvantages of self-representation. One of the inherent dangers – Well, Ferretta – Ferretta also cites Van Moltke, which specifically talked about knowing about the penalty. Indeed, Your Honor. And the court in Iowa v. Tovar said that in order for the constitutional requirements of a valid waiver to be satisfied, one of – Post-Ferretta. I'm sorry? Which was post-Ferretta. Yes. Yes, ma'am. Yes, Your Honor. It was post-Ferretta. And in that case – One of the problems we have here, by the way, is that your brief spent all its time relying on the Ninth Circuit direct appeal cases and didn't deal at all with the AEDPA problem, and so we were a little at sea, honestly. And, Your Honor, I didn't write the briefs, and I do apologize for that. I mean, it means that they were, you know, kind of completely off-point and – and made it hard to figure the case out. And I apologize for that. I can say that Ferretta in Iowa v. Tovar and Van Moltke were cited. And I apologize for the late notice, but, again, I was just recently assigned to this case, and, Your Honor, should have been handed a list of some additional citations from this Court. One of those cases was a case that this Court decided in 2010 called McCormick v. Adams. In that case, this Court reiterated the requirement that a defendant be made aware of the critical elements of self-representation, the nature of the charges, the possible penalties, and the dangers and disadvantages of self-representation. This Court has held that in AEDPA cases repeatedly, that the risks – one of the things that defendants must be notified of – Okay. But we've also been told recently that that doesn't matter either, what we think. I mean, if we were deciding in those cases that that was clearly decided, then I suppose it's useful. But the fact that we are simply citing it is not all that useful, right? Well, Your Honor, I mean, the Supreme Court recently held that this Court may look to its prior decisions in determining what clearly – the clearly established law is. I mean, Marshall v. Rogers does say that it's okay for this Court to look at its prior decisions. And McCormick v. Adams was a case under the AEDPA where this Court held only three years ago that defendants must be made aware of the nature of the charges against them. Another point that's critical about McCormick – Wait. That doesn't necessarily encompass this. I'm sorry. The possible penalties. This Court said in McCormick, and that's at page 977, this Court said that the nature of the charges, the possible penalties, the dangers and disadvantages are the three requirements of a valid waiver. And so that's a recent case. Citing Tovar or citing what? I'm sorry, Your Honor? Citing what? Tovar or citing what? This Court was citing United States v. Farhad when it said that particular That's the problem. That's a direct appeal case. It is. But this Court was interpreting the AEDPA in that case. It was applying the AEDPA, and it held that that is one of the requirements. And, again, the United States Supreme Court in Iowa v. Tovar said the same thing, that the range of allowable punishments is one of the things that must be considered. For a plea. I'm sorry? For a plea. For a plea in the context of a waiver of the right to counsel. For a plea. Right, Your Honor. But that case did involve Farhad, and it did involve the waiver of the right to counsel. And another point that's important about McCormick v. Adams is that in denying this claim, the Nevada Supreme Court held, as did the district court below, that one of the reasons I'm going to be a little critical again. I can't get a whole lot of your discussion of McCormick v. Adams because I didn't get that cite until I sat down here. It's not a meaningful discussion to me. And I apologize, Your Honor. I could have done it yesterday. Yesterday was Sunday. Well, even on a Sunday. Or a Friday. Honestly, Your Honor, I spent most of yesterday trying to get a flight here due to the plane crash that happened in San Francisco. It's just not helpful when your whole brief is totally off point, and now you're citing cases that we don't have before us. And again, Your Honor, all I can say is that I didn't write the briefs. If I had written them, they'd have been much different. But what is in the briefs and what is clearly established Federal law is Ferretta and is Iowa v. Tovar. And in looking at the Ferretta canvas in this case, no reasonable jurist could conclude that Mr. Arrandondo was correctly informed of the possible sentencing consequences of his case. When a defendant is deciding whether to waive his right to counsel, he's essentially rolling the dice, right? He's saying, what are the risks that I'm taking here? Am I going to gamble on representing myself and risking the maximum possible sentence? Or am I going to go with my counsel and see what happens there and probably, possibly receive a better result? So when rolling the dice on a 20-year sentence for a man who at the time of sentencing was 39 years old, he thought he would be out by the time he's 59 at the most. He thought he would have parole eligibility in eight years. That's what he thought he was rolling the dice on. The reality was he was rolling the dice on two life sentences. And for a man who's 39, that could mean as many as 40 or 50 years in prison. So that's a huge factor. Kagan. Mr. Court did mention the eight years specifically, didn't he, the parole? He did. Yes. Yes, Your Honor. The trial court told him he was looking at a maximum of 20 years with parole eligibility after eight. The reality was he was looking at two life sentences. So the calculus that Mr. Arendando made at the time was I'm looking at a max of 20 years, I'm going to roll the dice and do this myself. There is a reasonable probability that if he had been told he was looking at two life sentences, he might have made a different decision. It's not that I have to prove harm. I mean, Ferretta claims are harmless error claims, but it was a new trial. Your Honor, start all over. Yes, Your Honor. He should be entitled to go back, start all over and do this again and be able to have a representation by counsel, competent counsel. He did not receive competent counsel in this case. He did not receive proper notification of the range of punishments in this case. And for that reason, we would ask to reverse. I would like to reserve the rest of my time. Thank you. We'll hear from the State. Good morning, Your Honors. Karen Whelan for the appellee respondent. I think that if we really take a close look at what Ferretta requires, it would be instructive in this case. The interesting thing about Ferretta to me is that it talks about two rights that every defendant has. They have the right to counsel, but they also have the right to represent themselves. And in Ferretta, the court told the judges below, basically, that you cannot coerce a defendant into having counsel. I think two words that are used in Ferretta on two different occasions are really important too and instructive for us. They say you must know the rights that you're giving up, and you should know the pitfalls and dangers of representing yourself. In the instant case, the defendant was given an extensive Ferretta canvas. But isn't the risk of representing yourself different if the downside risk is six months as opposed to life imprisonment? Isn't that a different risk? It certainly is a different risk. So, and without getting into the colloquy question, but as to what he knew, because here, as I said before, we know what he knew, and he didn't know this. So why isn't the fact that he was laboring under a, he was, it's kind of like a calculus. I mean, he was discounting his, what he saw as the risks of having counsel by what he originally thought, one to seven or something, and then was told that it's something he'd get out in eight years. And as it turns out, he was at least exposed. I mean, there's this other question, which we should get into, about the fact that it didn't, what the habitual criminal complaint wasn't actually filed until later, but he had exposure to a life sentence. And he didn't know that. I mean, do you agree that he didn't know that? I mean, look at the record and say he didn't know that. I would agree that he did not know that a life sentence was going to come down the road to him, but I would not agree that he was not made aware of what he was exposed to, because he was made aware of his exposure as to what was before the court at that time. At the time of the canvas, he was told exactly what each of the charges came with in the form of sentence and fine. He was also made aware that as a result of that, he could spend up to 20 years in prison if those were to be run consecutively. That was what he was before. So just to be clear about what your position is, then. Is your position that it was essential that he know at least that much, but he did? Or is it that for right, it doesn't, given AEDPA, even that much doesn't have to be known? I would say that given AEDPA, even that much is not essential. But if I were to concede arguendo that he was to be made aware of the sentence, the sentence that he would have to have been made aware of is that which was before the court, because Ferretta can't use the judges to misinform the defendant as to all potential things out there. One, the judge doesn't have to be clairvoyant. He doesn't have to determine what is the DA going to do later. The DA doesn't have a responsibility here, and certainly there's no prosecutorial misconduct before us to discuss today. But as far as what the judge is responsible to do in a Ferretta canvas, he can't misinform the defendant so as to act as the person coercing him to have counsel as well. So there's a narrow line there that the judge has to walk when he's doing the Ferretta canvas. And to do what Ms. Fraley is asking, I assert would be to be coercing him by trying to scare him with things that are not before the court. Why is that? I don't understand that argument at all. Well, because Ferretta says he'd be in a position to make an informed decision. It's not before the court. The judge doesn't have a notice. But this isn't a canvas question, as we said before. It's a question of what he knew to make a knowing involuntary waiver. Now, the judge obviously could facilitate that by telling him things, but the question is, what did he know from however he knew it? Well, we know what he said out loud one time in court was when the canvas was being conducted and the judge said, do you know what your sentence could be? And he said, I think seven. Right. And then the judge told him something else, and both were actually inaccurate. Right. But we don't know if he knew anything else. We don't know if there are other pieces of knowledge that he knew. What we know is what he said and what the judge said and what Ferretta requires or urges, because as far as what Ferretta's ---- And it did, I mean, there were at least two documents filed that laid out his sentence, his history, and it was discussed at the actual Ferretta colloquy as well. Well, those, when you're at the plea hearing ---- No, because it doesn't come in the form of a complaint. I'm sorry, what? Functionally, at the plea hearing, what the DA is arguing from is an NCIC report or a local Nevada State scope report. There's nothing certified on that report. They haven't at that point necessarily gotten certified copies of JOCs. Those aren't before the court. Well, but we know here that, in fact, they had because it was two days later. I mean, they filed the complaint right after the conviction. The conviction was right after this. I mean, you can file the notice, but that doesn't necessarily mean at that point that they have the JOCs. They have to have all of that before sentencing. But ---- But the question is exposure, right? I mean, when you go to trial, you're exposed to whatever you're exposed to, but you may win the trial. He had counsel for 17 months prior to waiving his counsel. So he had counsel for 17 months. When he decides he doesn't want to ---- He said he never saw. Pardon me? He said he never saw. He ---- well, who he says he never saw, who counsel says that they were in contact with him. It was a little weird. They kept changing. Every day they showed up, somebody else showed up. Well, I guess it's a ---- I don't know how it works in other courts, but in the Las Vegas, there's a DA and a PD that appear at court, and oftentimes your assigned PD or DA are not there. So I don't know if that's just a different function or not. But at any rate, what Ed ---- what Feretta requires is that he be made aware of what is ---- what he's facing, and he was made aware of what he was facing. And to go beyond that, there's no court ---- there's no case law that says any judge has to admonish someone as to what might happen in the future when it's not before them. In fact, there was Nevada case law that said exactly that at one point. Scott. I don't know quite what happened to it. It was very unclear to me. It kind of went by the wayside as Graves came in and they said, no, we just need to look at the circumstances and make sure that he's being informed about the rights that he's losing or giving up, not losing, giving up, while he takes advantage of the other right. These are co-equal rights. It's not that the court is giving permission necessarily for this person to do something abstract in representing himself. It's that he has that right just as well as he has the right to counsel. And so that's the argument that I was making with regard to what you can inform him so that you're not crossing the line into actually being conducting a conversive or a coercive canvas. But it can be that if a judge had said to him, you're right now a sink stand, you're exposed to 20 years, and if there's an habitual criminal complaint filed after trial, and you have the requisite convictions, you could be exposed to life. That certainly wouldn't be coercive. It's true. It could be coercive because that could be the piece of information that convinces this particular defendant, I want to keep this counsel where apparently he didn't want that counsel. He wanted different counsel. This would be the third counsel he wanted, and he wanted standby counsel, which appear to be more delaying tactics than anything else. Well, the exposure was a possible life sentence. Exposure is so great that he might well say, you know, look, under these circumstances I want my counsel. He may or he may not. We won't know that. But what we do know is what Ferretta tells us. What do you do with Tovar? Well, Tovar had an opportunity. It only applies in the context of a plea? I think that if – I think that Tovar is a plea case. I think in that you have unique circumstances. But Tovar says that because it's a plea case, we're going to have less than we would have under Ferretta. It doesn't say we're going to have more. In the case of Tovar, it's very – it's distinguished by the fact that he's never had counsel. I believe you can distinguish the cases by the fact that defendant never had counsel. He's entering – he's giving up counsel and entering a plea all in the same sentence without knowing anything. At the same hearing. At the same hearing, yes. So he's not – he's not having any time in the case of where you're going to represent yourself at trial. You will have time to prepare. You'll have time to do the things that you would need to do to prepare. In this particular case with Tovar, he's not having any time before he goes from I want to represent myself to I'm guilty. And I think that that could be – But the case says the opposite. It says we're going to have a less formal and less rigorous requirement than we do under Ferretta, not a more – more. Well, it does. It then goes on – the decision then goes on to say that you don't have to provide those extras. Well, yeah, but your premise has to be that even though in a guilty plea you – there does have to be knowledge of the penalty, there doesn't have to be a trial. Why would that be? What sense would that make? I think that Tovar is instructed if you have a case where you have a defendant that is – first of all, we're dealing with a misdemeanor plea there, things that are functionally different at a misdemeanor level. I agree. In his case, there were enhancements that were available to the court, and in most DUI cases, I would presume that those enhancements come along with each level, as they do in Nevada. But it's just – it's different where you have a felony plea – or, excuse me, a felony defendant asking to use his right to represent himself. All different in the other direction, different that you want to have more protections, not fewer. Counsel, do you think it makes any difference that in Tovar the court winds up overturning a decision that you have to give additional warnings, and actually its holding it? Well, I think that it makes – It's cutting back what a State thought you had to do under Federal law. Well, I think that many of the States do more than you have to do under Federal law. I understand that. What I'm saying is, does that affect the way we should read Tovar? It's talking about all this stuff, but what it's really saying, what it's really deciding, it says, is that there are two things you don't have to do. Does that make any difference? I think that Tovar is instructive in telling you, at least in the context of AEDPA, that the extra things that Iowa wanted to enforce upon the Tovar case, you're not going to – you don't have to do that. And if you relate that to Ferretta, where Ferretta is telling you you must tell them what they're giving up in the form of the right to counsel, and you should tell them about the pitfalls and dangers of representing yourself, there is less requirement for going beyond what's in front of that defendant on that day. And on that – for that defendant on that day, before that court, was up to 20 years consecutive for the counts that he was charged, and he was informed of that. Judge Fernandez is correct. I mean, that the court said you didn't have – that state courts weren't required to give the added warnings that Iowa required. But the court goes on to say, we hold that neither warning is mandated by the Sixth Amendment, then says the constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attended upon the entry of a guilty plea. The range of possible punishments attended upon the entry of a guilty plea. It's a little bit distinguishable, but in answering your question how you might want to interpret it in the instant case, he was advised of the range of allowable punishments under the charges on that day. And to speculate that the State knew they were going to – knew that they were going to put – But that's one way of looking at it. The other way of looking at it is the question is conditional or exposure, i.e., what could happen. And obviously, this could happen. It did happen. So it was part of his exposure, because unlike with any other kind of an indictment in which it has to be before the trial, this one is after the trial, so therefore in order to – I mean, do you think there's any doubt that a decent lawyer would have told him this before he made any decision, for example, to plead guilty? I don't know that a lawyer didn't tell him that. I'm not asking you that. I'm asking you isn't it a relevant consideration even – even though the complaint hadn't been filed? It would be a relevant consideration. And he said he had exposure to it. It would be a relevant consideration, but what we also know is when an individual decides to represent themselves, and this judge did admonish him as to all the knowledge that he was going to be up against with his lack of knowledge of the legal system, and that's a pitfall. And he was advised of those pitfalls, and that's just included in what would be a pitfall. And I would assert that everything was done properly here, and that should be denied. Thank you. Thank you, counsel. I believe you had about a minute and a half left for a rebuttal. Yes, Your Honor. No reasonable jurist could look at this record and conclude that Mr. Arendando's eyes were wide open when he entered – when he waived his right to counsel in this case. Furthermore, telling a defendant the truth about his case can never be coercive. But, you see, you keep going back to the telling, and here I do have a certain amount of concern about the judge being able to tell him anything, because he didn't necessarily know what his convictions were. The trial judge did know what his convictions were, Your Honor. Well, he maybe should have known. It was in some pieces of paper. But at one point he did say, well, I don't know, even after the pieces of paper had been filed. So, obviously, this is a busy man, and he didn't necessarily know. This was a busy man who was three times prior to this canvas informed that Mr. Arendando was a three-time convicted felon and specifically denied bail modification requests on that ground and was reminded of that at the hearing when Mr. Arendando asked the court, can the prosecution use my priors against me? This experienced jurist knew that the State was going to seek habitual criminal status. Well, he didn't necessarily know that, but he certainly knew that there was – you're saying that he knew there was exposure. Yes. He knew there was exposure. He absolutely knew there was exposure. And as Your Honor pointed out, what matters in this case is not so much what the trial court knew, it's what the defendant knew. This record indicates that Mr. Arendando did not know that he was going to be facing sentencing under the habitual criminal status. This Court has never held in the context of the AEDPA that a waiver of counsel is valid or the defendant was misinformed about the sentencing consequences of his case. Mr. Arendando was – Any court? Your Honor, I focused on Supreme Court precedent and this Court's precedent, so I can't, unfortunately, answer that question. But the State concedes that Mr. Arendando was not told about the habitual criminal status. He – the Nevada Supreme Court held that one of the reasons that the waiver was valid was because a defendant has to be informed of the risks and complexities of his decision and that Mr. Arendando was. That is clearly an unreasonable application of the law and of the facts in this case. All right, counsel. Thank you. I think we got your argument. The matter is submitted. Thank you, counsel. We appreciate your arguments. Safe travels back to Nevada.
judges: Fernandez, Paez, Berzon